## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

KRISA NEUMANN,           )
           )
     **Plaintiff,**     )
           )
      **v.**        )     **Case No. 1:04cv928**
           )
PRUDENTIAL INSURANCE COMPANY  )
OF AMERICA,         )
           )
     **Defendant.**    )

### MEMORANDUM OPINION

In this ERISA[1] action, plaintiff Krisa Neumann, a former Freddie Mac[2] employee, was diagnosed with fibromyalgia and inactive autoimmune disease, and ultimately left her job because her illness, she claims, left her totally disabled. She received short-term disability ("STD") benefits from Freddie Mac for six months, which are not at issue here, but when she later sought long-term disability ("LTD") benefits under an ERISA-governed employee welfare benefit plan ("the Plan"), administered and insured by Prudential Insurance Company of America ("Prudential"), her claim for benefits was first granted, then denied. It is this second denial of LTD benefits that is at issue here. Specifically, plaintiff brings her claim for relief from this denial of benefits under 29 U.S.C. § 1132(a)(1)(B),[3] alleging that Prudential improperly

---

[1] Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. § 1001 *et seq.*

[2] Federal Home Loan Mortgage Corporation ("Freddie Mac").

[3] 29 U.S.C. § 1132(a)(1)(B) empowers participants in, or beneficiaries of, an ERISA-governed employee benefits plan to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

determined that she did not qualify for LTD benefits under the Plan's definition of "Total

Disability."

At issue on plaintiff's motion for judgment and cross-motions for summary judgment are

the following questions:

> (i) whether the Plan language, which provides that benefits will be awarded when "Prudential determines that" certain conditions are met, indicates a clear intention to confer discretion on the Plan administrator, thus warranting abuse of discretion review, or whether it fails to confer such discretion, thus warranting *de novo* review;

> (ii) whether the proper procedural posture of this case is summary judgment or rather a bench trial on the evidence presented to the Plan administrator; and

> (iii) whether the facts in the record presented to the Plan administrator require a finding of "Total Disability" under the terms of the Plan.

As the matter has been fully briefed and argued, it is now ripe for disposition.

## I. Scope of Review

The parties agree that the Plan is part of an ERISA-governed "employee welfare benefit

plan"[4] and, therefore, that plaintiff, as a "beneficiary" of that Plan, is entitled to bring a civil

action to recover disability benefits if those benefits are due to her under the terms of the Plan.

*See* 29 U.S.C. § 1132(a)(1)(B). They do not agree, however, on the proper standard of review

that should be applied.  Because the procedural posture of this case may depend in part on the

judicial standard of review, it is appropriate to begin by determining whether Prudential's

decision to deny benefits should be reviewed for an abuse of discretion or *de novo*.

It is well-settled that a denial of benefits challenged under § 1132(a)(1)(B) is to be

reviewed *de novo* in the district court *unless* "the benefit plan gives the administrator or fiduciary

_____

[4]  *See* 29 U.S.C. § 1002(1).

discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the standard of review is for an abuse of discretion.[5] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522-23 (4th Cir. 2000) (abuse of discretion review warranted only when plan "vest[s] in its administrators discretion either to settle disputed eligibility questions or construe doubtful provisions of the Plan."). Although no specific phrases or terms are required to confer this discretionary authority, the plan's intention to do so "must be clear." *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268-69 (4th Cir. 2002) (citation omitted); *Feder*, 228 F.3d at 522 (a plan will confer discretionary authority "if the terms of a plan indicate a clear intention to delegate final authority to determine eligibility to the plan administrator."). Any ambiguity in an ERISA plan "is construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured." *Gallagher*, 305 F.3d at 269 (quoting *Bynum v. Cigna Healthcare, Inc.*, 287 F.3d 305, 313-14 (4th Cir. 2002)). Put simply, if a plan does not clearly grant discretion to interpret the plan, no deference is owed to the plan administrator's decision and the standard of review is *de novo*.[6] *See id.* These principles, applied here, compel

---

[5] Under an abuse of discretion standard, an administrator or fiduciary's decision will not be disturbed if it is "reasonable," which has been interpreted in this context to mean that the decision is "the result of a deliberate, principled reasoning process and [that] it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997) (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995)).

[6] It is also worth noting that even when the abuse of discretion standard is applied, where, as here, an ERISA-governed benefits plan is both funded and administered by the same entity, and thus the administrator operates under a conflict of interest, the reviewing court must apply a "sliding scale" of review in which the abuse of discretion standard is "lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (quoting *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996)).

the conclusion that Prudential's decision to deny benefits to plaintiff must be reviewed *de novo*.

Analysis of this issue properly begins with the language of the Plan, which provides for payment of LTD benefits if the applicant establishes the existence of either "Total Disability" or "Partial Disability." According to the Plan's terms, " 'Total Disability' exists when *Prudential determines*" that certain conditions are met.[7]  Prudential argues that the phrase – "Prudential determines" – is sufficient to trump the presumption in favor of *de novo* review and to confer discretionary authority upon Prudential to make benefits decisions.  Notably, Prudential points to no other qualifying or amplifying language in the Plan, but rather relies solely on this phrase. Because this phrase, by itself, cannot vest in Prudential the discretion to interpret the terms of the Plan, it does not warrant abuse of discretion review.

To begin the interpretive task, the Plan's terms must be given their "plain meaning." *Pirozzi v. Blue-Cross-Blue Shield of Va.*, 741 F. Supp. 586, 589 (E.D. Va. 1990) (citing *Johnson v. District 2 Marine Eng'rs Beneficial Ass'n*, 857 F.2d 514, 516 (9th Cir. 1998)).  And the plain meaning of the word "determine" is "to settle or decide (a dispute, question, matter in debate) as a judge or arbiter."  *See* 4 Oxford English Dictionary 550 (2d ed. 1989).  Thus, the phrase makes clear that Prudential, as the Plan administrator, is given the initial authority to make a *decision* regarding eligibility.  In other words, Prudential is not required to accept reflexively the beneficiary's representation that she is totally disabled within the meaning of the Plan.  A claimant must present evidence of her disability to Prudential, which has been allocated the

---

[7] The emphasis added here was not in the original.  For the full definition of Total Disability, *see infra* Section III.

responsibility to make an initial decision regarding eligibility.[8]  But the verb "determine" implies

nothing one way or the other about the scope of judicial review of Prudential's decision.[9]  Merely

conferring authority to decide eligibility for benefits does not plainly delegate "final authority" to

do so.  *Feder*, 228 F.3d at 523.  Nor does it confer discretion on the Plan administrator "to settle

disputed eligibility questions or construe doubtful provisions of the Plan." *Id.* at 522.  Simply

put, a grant of discretion must be more explicit.  *See Gallagher*, 305 F.3d at 269.  Thus, the

Plan's plain language fails to reflect the requisite "clear" intention to confer upon Prudential any

discretion to interpret or administer the Plan.  *Id.*

   To the extent the phrase "Prudential determines" is deemed ambiguous with regard to

whether discretion is conferred, the phrase must be construed against the drafter of the plan and

in accordance with the "reasonable expectations of the insured."  *Gallagher*, 305 F.3d at 269;

*Sandy  v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000) ("Neither the

parties nor the courts should have to divine whether discretion is conferred.") (quoted in

*Gallagher*, 305 F.3d at 268-69).  This means that even assuming, *arguendo*, that the phrase is

ambiguous on this issue, it must be construed as conferring no discretion on the administrator to

interpret or apply the Plan.  And, this is so because the "reasonable expectation[] of the insured"

---

   [8]  *See Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 111-13 (9th Cir. 2001) (holding that plan language, "the carrier will make all decisions on claims ...," does not mean that plan administrator's decisions are final and unreviewable but rather makes clear that the plan administrator, not an employer or some other party, makes all administrative decisions to grant or deny claims).

   [9]  *See Gallagher*, 305 F.3d at 270 n.6 (reasoning that delegation of authority to plan administrator to "make a determination regarding whether a claimant has submitted satisfactory proof [to the plan administrator] ... 'implies nothing one way or the other about the scope of judicial review of its determination.' ") (quoting *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000))

is surely that he or she will enjoy the more favorable and default *de novo* review standard, especially where, as here, the Plan administrator operates under a conflict as both insurer and administrator of the Plan.   What is more, in drafting the Plan language, it would not have been difficult for Prudential to ensure that its decisions regarding eligibility would be reviewed for an abuse of discretion.   Prudential easily could have drafted language that unambiguously conferred discretion on the administrator to interpret the terms of the Plan.   Indeed, examples of such unambiguous language abound.[10]   Given the ease of drafting discretion-conferring language and given the obvious importance of a plan participant's right to *de novo* review of ERISA benefits decisions, it is appropriate to require that ERISA plan language unambiguously delegate discretion to the plan administrator to avoid a haphazard or unknowing waiver of this right.   *See Ingram*, 244 F.3d at 1113 ("We think it appropriate to insist ... that the text of a plan be unambiguous.   If an insurance company seeking to sell and administer an ERISA plan wants to have discretion in making claims decisions, it should say so.   It is not difficult to write, 'The plan

---

[10]   *See, e.g.*, *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1186-87 (4th Cir. 1989) (plan administrator given power "to determine all benefits and resolve all questions pertaining to the administration, interpretation, and application of plan provisions"); *Herzberger*, 205 F.3d at 331 (establishing "safe harbor" in Seventh Circuit of clear grant of discretion for the phrase, "Benefits under this plan will be paid only if the plan administrator decides that the applicant is entitled to them"); *Conrad v. Cont'l Cas. Co.*, 232 F. Supp. 2d 600, 602 (E.D.N.C. 2002) (plan granted "complete discretionary authority" to administrator); *Pirozzi*, 741 F. Supp. at 589 (eligibility for benefits could be denied "if the Plan determines, in its sole discretion, that care is not Medically Necessary").

Of course, it is well-settled that the grant of discretionary authority need not be explicit; the Fourth Circuit will recognize discretionary authority by implication, but the intention to grant such authority still must be clear. *See Feder*, 228 F.3d at 523; *see also, e.g., Boyd v. Trustees of the United Mine Workers Health & Retirement Funds*, 873 F.3d 57, 59 (4th Cir. 1989) (reviewing benefits denial for abuse of discretion where plan granted administrators the "full and final determination as to all issues concerning eligibility for benefits" and "authorized [them] to promulgate rules and regulations to implement this plan").

administrator has discretionary authority to grant or deny benefits under this plan.'"").

In sum, the plain meaning of the phrase "Prudential determines" is that Prudential,

considering the evidence presented by a Plan participant, must decide whether the participant is

eligible for benefits under the terms of the Plan; it does not imply discretion or warrant abuse of

discretion review.  And because the phrase's meaning is unambiguous, no further analysis is

necessary.  But even assuming the phrase is ambiguous, the same result obtains because the

phrase must then be construed against the drafter of the Plan and in accordance with the

reasonable expectation of the insured that a denial of benefits under the Plan will be reviewable

*de novo* in federal court.

Although the Fourth Circuit has never squarely addressed whether the verb "determine" is

sufficient to confer discretion on an ERISA plan administrator,[11] other courts have done so and

convincingly support the result reached here.  Particularly instructive in this regard is the Seventh

---

[11] Prudential argued at the hearing, though not in its brief, that the Fourth Circuit's
decision in *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783 (4th Cir. 1995), did address this issue,
holding that the term granted discretion to the plan administrator.  This contention is incorrect;
the parties in *Bernstein* did not dispute that the plan agreement granted discretion to the plan
administrator; instead, they disputed only whether the plan administrator, operating under a
conflict of interest, should be afforded less deference to account for the conflict of interest.  *See
id.* at 788.  Thus, the Fourth Circuit in that case neither reached nor decided the question
addressed here.  Also worth noting is that the plan language at issue in *Bernstein* differed from
the Prudential Plan language at issue here.  Specifically, not only did the agreement state that
benefits would be paid " '*only if* CapitalCare determines' that certain conditions are met," the
agreement further provided that "CapitalCare may adopt reasonable policies, procedures, rules
and interpretations to promote the orderly and efficient administration of this agreement."  *Id.*
(emphasis added).  The Prudential Plan at issue here is not similarly modified by the restrictive
phrase "only if," nor is it amplified by a similar explicit grant of discretion to interpret the Plan.
In any event, *Bernstein* did not reach or decide the precise question presented here, and hence the
cases that cite it for this proposition are not persuasive. *See Eubanks v. Prudential Ins. Co. of
Am.*, 336 F. Supp. 2d 521, 528 (M.D.N.C. 2004) (relying on *Bernstein* to conclude that
Prudential plan language confers discretion); *Beam v. Prudential Ins. Co. of Am.*, 2004 U.S. Dist.
LEXIS 4188, at *8-9 (M.D.N.C. 2004) (same).

Circuit's decision in *Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir. 2000).  In

*Herzberger*, the Seventh Circuit presented with precisely the same Prudential Plan language

concluded the Plan conferred no discretion on the administrator.  *See id.* at 333.  Judge Posner,

writing for a unanimous court, reasoned that simply stating that an administrator must make

certain determinations before granting benefits is a mere truism; it implies nothing one way or

the other about the scope of judicial review of that determination any more than an appellate

court's statement that a district court "determined" some conclusion indicates the scope of

review of that decision on appeal.  *Id.* at 332.  Further, Judge Posner opined that "[o]bviously a

plan will not – could not, consistent with its fiduciary obligation to the other participants – pay

benefits without first making a determination that the applicant was entitled to them."  *Id.*  To

hold otherwise, reasoned Judge Posner, would fail to give plan participants adequate notice that

they were waiving their important right to *de novo* review.  *See id.* ("[T]he mere fact that a plan

requires a determination of eligibility ... by the administrator ... does not give the employee *notice*

that the plan administrator is to make a judgment largely insulated from judicial review by reason

of being discretionary.") (emphasis added).  Other courts thoughtfully considering this issue have

reached the same result for similar reasons.[12]

---

[12] *See Nichols v. Prudential Ins. Co. of Am.*, 2005 U.S. App. LEXIS 6837, at *25 (2d Cir. Apr. 21, 2005); *Rothstein v. Prudential Life Ins. Co.*, 2001 U.S. Dist. LEXIS 24740, at *2 (C.D. Cal. 2001); *O'Sullivan v. Prudential Ins. Co. of Am.*, 2001 U.S. Dist. LEXIS 8637, at *3-4 (S.D.N.Y. 2001); *Deal v. Prudential*, 222 F. Supp. 2d 1067, 1070 (N.D. Ill. 2002); *Ehrman v. Henkel Corp. Long-Term Disability* Plan, 194 F. Supp. 2d 813, 818 (C.D. Ill. 2002).  *But see Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (concluding without explanation that "as determined by the ... Medical Director" conferred discretion); *Clapp v. Citibank, N.A.*, 262 F.3d 820, 823 (8th Cir. 2001) (holding that where disability was defined as "a mental or physical condition which the Claims Administrator/Fiduciary determines," abuse of discretion review was appropriate); *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1259 (10th Cir. 1998) (concluding, without explanation, that "determined by Prudential" confers discretion).

Thus, the verb "determines," by itself, does not clearly vest in Prudential the discretion to interpret the Plan's terms. It follows, therefore, that the Plan language does not warrant departure from the presumptive *de novo* review of the federal courts under ERISA.

## II. Procedural Posture

The scope of review is not the only procedural question to resolve; it is also necessary to determine the appropriate procedural posture of this case, namely whether the case should be dealt with under Rule 52 or Rule 56. Although plaintiff has moved in the alternative for summary judgment pursuant to Rule 56, Fed. R. Civ. P, she argues that application of the summary judgment standard would be inappropriate here because there are disputed issues of fact, and as plaintiff correctly observes, the function of a district court at the summary judgment phase is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Yet, plaintiff does not simply argue that summary judgment should be denied; she contends summary judgment is never appropriately applied to § 1132(a)(1)(B) denial of benefits claims, as the Sixth Circuit held in *Wilkins v. Baptist Healthcare Systems, Inc.*, 150 F.3d 609 (6th Cir. 1998). While the Fourth Circuit has not explicitly decided whether summary judgment is appropriate in the § 1132(a)(1)(B) context, it has indicated in one published decision that it shares the Sixth Circuit's reservations articulated in *Wilkins* and recognizes the inappropriateness of "importing the summary judgment standard whole-cloth into the ERISA context." *Phelps v. C.T. Enters.*, 394 F.3d 213, 218 (4th Cir. 2005) (citing *Wilkins*, 150 F.3d 609). Unfortunately, because the panel in *Phelps* was not required to decide the question, it did not do so and its

comments on this point are *dicta*.[13]  It is necessary, therefore, to confront and decide here whether the instant § 1132(a)(1)(B) claim, which involves disputed facts, should be disposed of under Rule 52 or Rule 56.

The Sixth Circuit noted in *Wilkins* that district courts typically resolve claims brought under § 1132(a)(1)(B) in one of two ways: (i) by utilizing the summary judgment procedures set forth in Rule 56, or (ii) by conducting a bench trial on the merits, making findings of fact and conclusions of law pursuant to Rule 52.  *Wilkins*, 150 F.3d at 617-18 (Gilman, J., concurring).[14] The Sixth Circuit went on to conclude, however, that neither standard is appropriately applied to claims brought under § 1132(a)(1)(B).  First, it concluded that a bench trial is inappropriate because it would "inevitably lead to the introduction of testimonial and/or other evidence that the administrator had no opportunity to consider." *Id.* at 618.  In the Sixth Circuit, in contrast to the Fourth Circuit,[15] *de novo* review is limited strictly to the evidence before the plan administrator. *Id.* (citing *Perry v. Simplicity Eng'g*, 900 F.2d 963 (6th Cir. 1990)).  Thus, the court concluded, a bench trial, which would require the admission of evidence, would be inappropriate.  The *Wilkins*

---

[13] In *Phelps*, the Fourth Circuit noted that the perplexities that arise from the application of the summary judgment standard in ERISA cases "arise chiefly when courts are reviewing claims for benefits under 29 U.S.C. § 1132(a)(1)(B)." 394 F.3d at 218.  Yet, because the parties there pressed no such claims, the panel proceeded to examine the appeal under the normal summary judgment standard.  *Id.* at 218.

[14] Although Judge Cole announced the judgment of the court, he concluded that it was unnecessary to decide whether the lower court's entry of summary judgment was an appropriate way to dispose of ERISA cases generally.  *See Wilkins*, 150 F.3d at 616-17.  Thus, Judge Gilman delivered a separate opinion, in which Judge Ryan concurred, which constituted the opinion of the court on the issue of the proper procedural posture for claims raised under § 1132(a)(1)(B). *See id.* at 617.

[15] *See Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (permitting introduction of additional evidence in limited circumstances on *de novo* review).

court found similar problems with the Rule 56 summary judgment standard.  Specifically,

because it had concluded that a § 1132(a)(1)(B) claim could not be resolved on a regular bench

trial, it reasoned that it "makes little sense to deal with such an action by engaging a procedure

designed solely to determine 'whether there is a genuine issue for trial.' " *Id.* at 619 (citing

*Anderson*, 477 U.S. at 249).  For these reasons, the Sixth Circuit adopted suggested guidelines

for courts that, in essence, prescribe a paper review of the record presented to the plan

administrator, but which it did not tether to any specific procedural rule.  Specifically, it directed

district courts (i) to conduct a *de novo* review of the record and to make findings of fact and

conclusions of law, (ii) that evidence outside the record may be offered only in support of a

procedural challenge, and (iii) that Rule 56 motions should not be utilized.  *See id.*

The Sixth Circuit's resolution of the matter does not quite fit within existing Fourth

Circuit precedent.  While the Sixth Circuit eschewed the summary judgment standard for §

1132(a)(1)(B) claims, and concluded that a bench trial cannot be held when no evidence can be

admitted, Fourth Circuit law suggests that both summary judgment and bench trial procedures[16]

may be applied to ERISA § 1132(a)(1)(B) claims, at least on *de novo* review.[17]  In the Fourth

---

[16] It is well-settled in the Fourth Circuit that there is no right to a jury trial in proceedings to determine rights under employee benefits plans.  *See Ellis v. Metropolitan Life Ins. Co.*, 919 F. Supp. 936, 937 (E.D. Va. 1996) (citing *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir. 1985)).

[17] Not decided here is whether a different answer might obtain when a district court reviews a plan administrator's decision under a deferential abuse of discretion standard.  In that case, different from a court conducting a *de novo* review of a plan administrator's denial of benefits, the district court is limited to the evidence that was before the plan administrator at the time of the decision.  *See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994) (reaffirming holding in *Berry v. Ciba-Geigy*, 761 F.2d at 1007).  Additionally, instead of making its own findings of fact, the district court reviews the findings of the administrator to determine whether they are reasonable.  *Id.*  Thus, it may be that the summary

Circuit, district courts conducting a *de novo* review of benefits decisions have discretion to consider evidence not before the administrator, if exceptional "circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefits decision." *See Quesinberry*, 987 F.2d at 1025.[18]  Thus, in some instances on *de novo* review of a benefits decision pursuant to § 1132(a)(1)(B) claim, it is appropriate in the Fourth Circuit to conduct a bench trial, including the introduction of additional testimonial or other evidence. Further, even if a district court elects not to consider evidence beyond the record presented to the plan administrator, it seems appropriate, as both the Second and Ninth circuits have sensibly concluded, for a district court to conduct a "bench trial 'on the papers' with the district court acting as the finder of fact."[19]  In essence, this "de novo review of the parties' submissions" and

---

judgment standard, designed to determine whether "there are any genuine factual issues that properly can be resolved" by a fact-finder at trial would make little sense when applied on abuse of discretion review and thus is inappropriate. *Anderson*, 477 U.S. at 250; *see also Phelps*, 394 F.3d at 218 (noting that Fourth Circuit shares Sixth Circuit's reservations articulated in *Wilkins* and citing *Berry v. Ciba-Geigy*).  In any event, it is unnecessary to decide this issue because the review here is *de novo*.

[18] Factors that might warrant the introduction of additional evidence include the following: "claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; ... instances where the payor and the administrator are the same entity and the court is concerned about impartiality; ... and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process." *Quesinberry*, 987 F.2d at 1027.

[19] *See Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (vacating grant of "motion for judgment on the administrative record," and remanding for findings of fact and conclusions of law pursuant to Rule 52, Fed. R. Civ. P.); *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 134 (2d Cir. 2001) (reviewing findings and conclusions made after "*de novo* review of the administrative record"); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) (reversing grant of summary judgment and remanding to resolve genuine issue of fact by "trial on the administrative record") (en banc).

the record before the administrator, is a bench trial on the paper record.  *Muller*, 341 F.3d at 124.

And just like any other bench trial, Rule 52(a) requires that the district court make explicit

findings of fact and conclusions of law.  *See* Rule 52(a), Fed. R. Civ. P. ("In all actions tried

upon the facts without a jury or with an advisory jury, the court shall find the facts specially and

state separately its conclusions of law thereon ... ."); *see also Muller*, 341 F.3d at 124-25;

*Kearney*, 175 F.3d at 1095.  Different from a traditional bench trial, however, these findings and

conclusions are made only from the paper record before the plan administrator without additional

oral evidence submitted in court. Thus, if a district court makes explicit findings of fact and

conclusions of law, a bench trial on the record is an appropriate means of disposing of a §

1132(a)(1)(B) claim on *de novo* review.

 While the Sixth Circuit reached essentially the same conclusion, *i.e.* that a district court

should make findings of fact and conclusions of law from the paper record, it did not recognize

this *de novo* review of the paper record as a bench trial.  As a result, it rejected application of the

Rule 56 summary judgment standard to ERISA § 1132(a)(1)(B) claims, which is designed to

determine "whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Yet, because

the Sixth Circuit's characterization of this procedure is not adopted here, there is no reason to

reject the summary judgment standard in § 1132(a)(1)(B) cases.  To be sure, there are  ERISA §

1132(a)(1)(B) claims that involve no disputes of material fact, but merely a dispute over whether

the undisputed facts are sufficient to trigger benefits under a plan's disability definition.[20]  In

---

 [20]  Of course, it may be that in the large majority of cases, as here, the paper record will
present at least some material issue of fact.  Because of this, the Sixth Circuit concludes that
there is little benefit to having the district court "first filter the administrator's ruling through a
summary-judgment strainer." *Wilkins*, 150 F.3d at 619.  Nonetheless, even if summary judgment
is not often granted, there appears to be no reason to abandon the well-established summary

these circumstances, summary judgment is appropriate.

In the case at bar, however, summary judgment is plainly inappropriate. This record is bristling with disputed material issues of fact, as a wide range of experts for both parties disagree about whether plaintiff suffers from illnesses that render her unable to fulfill the substantial duties of any job for which she is qualified. Given this, a bench trial on the paper record presented to the Plan administrator is appropriate, as there are no exceptional circumstances warranting the admission of additional evidence. *See supra* note 18. What follows, therefore, are the requisite findings of fact and conclusions of law based on the paper record presented to Prudential before it finally denied plaintiff's request for LTD benefits.

## III. Findings of Fact and Conclusions of Law

### A. The Parties

1. Plaintiff Krisa Neumann was employed as a Senior Business Analyst by Freddie Mac from March 2, 1998 until March 15, 1999. Plaintiff's duties as a Senior Business Analyst were entirely sedentary in nature. Prior to her employment with Freddie Mac, plaintiff was employed for four years as a Program Analyst with the U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, where she was consistently recognized for excellence and outstanding performance.

2. As a benefit of her employment, Freddie Mac provided plaintiff with access to group disability income insurance. If eligible, plaintiff was entitled to STD benefits under a plan administered and funded by Freddie Mac – these benefits are not at issue here – and LTD

---

judgment standard, or to fashion a standard untethered to the Federal Rules. Moreover, in those cases that present no genuine issue of fact, the district court is free to resolve the matter on summary judgment (without making detailed findings of fact and conclusions of law).

benefits, under a Plan funded through a Group Insurance Contract with Prudential, which also administered the Plan.

**B. The Prudential Plan**

3.  The Plan provides for the payment of LTD benefits when the beneficiary has a "long period" of "Partial Disability" or "Total Disability."  These benefits begin after an Elimination Period of 180 days, which is equivalent to the length of time for which Freddie Mac provides disability coverage under its STD plan.

4.  The Plan defines "Total Disability" as follows:

"Total Disability" exists when Prudential determines that all of these conditions are met:

(1) Due to Sickness or accidental Injury, both of these are true:

(a) You are unable to perform, for wage or profit, the material and substantial duties of your occupation.

(b) After the Initial Duration[21] of a period of Total Disability, you are not able to perform for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience.  The Initial Duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

5.  In plaintiff's case, the Plan provides for LTD benefits equivalent to 60% of her monthly salary less any offset for certain other benefits received, including Social Security Disability Benefits.[22]

_____

[21] The Schedule of Benefits reflects that the Initial Duration period is the Elimination period (180 days) plus twenty-four (24) months.

[22] Plaintiff argued before the Plan administrator that she is entitled to 70% of her monthly salary because she enrolled in the "Buy-Up Plan," which entitles participants to a higher percentage of their monthly earnings than the "Core Plan."  This appeal was twice denied because, according to Prudential, plaintiff left work less than twelve (12) months after purchasing

**C.  Short-Term Disability Benefits**

6.  Plaintiff received STD benefits for 180 days based on her claim that she could not perform her job as a Senior Business Analyst because she suffered from fibromyalgia.  Although plaintiff's STD benefits are not in issue here, the facts relating to the award of these benefits are relevant to the LTD benefit issues and are therefore recounted here.

7.  Plaintiff was first diagnosed with fibromaylgia and an inactive autoimmune disorder in November 1998 by Thomas R. Cupps, M.D., a board-certified internist, specializing in rheumatology, and assistant professor of medicine at the Georgetown University Medical Center.

8.  Fibromyalgia is a rheumatic disorder which causes severe pain in the muscles, ligaments, and tendons.  It is characterized by diffuse pain, tenderness, stiffness of joints, fatigue, cognitive and memory problems, and disturbed sleep.  *See Stup v. Unum Life Ins. Co. of Am.*, 390 F.3d 301, 302 (4th Cir. 2004) (citing Nat'l Institutes of Health, *Questions & Answers About Fibromyalgia* 1 (rev. June 2004), *available at* http://www.niams.nih.gov/hi/topics/fibromyalgia/ Fibromyalgia.pdf)); *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 231 n.1 (4th Cir. 1997) (quoting Taber's Cyclopedic Medical Dictionary (16th ed. 1989)); *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996)).  Its cause is unknown, there is no cure, and there are currently no objective, laboratory tests for the presence or severity of fibromyalgia.  *See Sarchet*, 78 F.3d at 306; Nat'l Institutes of Health, *supra*, at 4-5.  Yet, according to the American College of Rheumatology, the condition may be *clinically* diagnosed through a muskuloskeletal examination, by which patients qualify for the classification of fibromyalgia by the presence of

---

the Buy-Up Plan, and thus, was not entitled to coverage for pre-existing conditions, including fibromyalgia.  Appeals of this decision were twice denied and plaintiff has not requested review of this decision here.

pain in 11 of 18 tender points located throughout the body.  *See* Wolfe, et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 *Arthritis & Rheumatism* 160-72 (1990) (cited in *Conrad v. Cont'l Cas. Co.*, 232 F. Supp. 2d 600, 603 (E.D.N.C. 2002)); *Stup*, 390 F.3d at 303; *Sarchet*, 78 F.3d at 306.[23]  Fibromyalgia "can interfere with a person's ability to carry on daily activities." *Stup*, 390 F.3d at 302 (citing Nat'l Institutes of Health, *supra*, at 1.)  And while "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, most do not." *Id.* (citing *Sarchet*, 78 F.3d at 307).

9.  In reaching his diagnosis, Dr. Cupps relied on plaintiff's self-described worsening symptoms, including profound fatigue, diffuse pain, non-restorative sleep and cognitive dysfunction.[24]  In January 1999, Dr. Cupps also conducted a musculoskeletal examination and found a pattern of diffuse tenderness, consistent with clinical fibromyalgia.  Laboratory testing also revealed significantly elevated titer ANA (or anti-nuclear antibodies), which is generally associated with the presence of an autoimmune disease.  Dr. Cupps found no clinical evidence of an active autoimmune disease, but ultimately concluded that plaintiff suffers from undifferentiated autoimmune disease syndrome and fibromyalgia.

10.  On March 15, 1999, plaintiff stopped working at Freddie Mac and began receiving

---

[23] Patients that suffer from this disorder may also experience fatigue, irritable bowel syndrome, sleep disorder, chronic headaches, jaw pain, memory impairment, skin and chemical sensitivities, as well as dizziness and lightheadedness. *See id.*  Prudential does not contest plaintiff's diagnosis of fibromyalgia, but only whether her fibromyalgia renders her totally disabled under the meaning of the Prudential Plan.

[24] Plaintiff began experiencing fatigue as early as 1994 and she experienced the onset of her other symptoms in 1997.  The record suggests that these symptoms worsened over time.

STD benefits.  These STD benefits were paid to plaintiff under a short-term disability plan administered by Freddie Mac's Occupational Health Unit.  The benefits were initially granted for twelve weeks and later extended for a total of 180 days.  In reaching its decision to authorize plaintiff's request for short-term benefits, Freddie Mac relied on the opinion of its own in-house file reviewer, Joseph M. Marietta, M.D., and a letter from Dr. Cupps explaining that plaintiff had made a concerted effort to improve her current level of activity, but that her fibromyalgia and autoimmune disease were exacerbated by stress and the demands of her work responsibilities, which were co-factors in the expression of her clinical symptoms.

**D. Long-Term Disability Benefits**

11.  On August 6, 1999, one month before the expiration of her STD benefits from Freddie Mac, plaintiff applied for LTD benefits under the Plan administered and funded by Prudential.  Plaintiff underwent two separate reviews of her claim for LTD benefits under two slightly different standards of review.[25]  The first review resulted in a finding of Total Disability for the Initial Duration, or the twenty-four months from September 1999 until September 2001. At the conclusion of the two-year period, Prudential conducted a second review and denied benefits.  It is this second decision that plaintiff challenges here.

12.  Plaintiff's first application for LTD benefits was reviewed for Prudential by an independent file reviewer, Gwen Brachman, M.D., a specialist in internal medicine, rheumatology and occupational medicine. Significantly, Dr. Brachman did not personally examine or interview plaintiff, but recommended denial of plaintiff's claim, noting that the record reflected no evidence of an active autoimmune disease, no evidence of synovitis, no

---

[25] *See supra* ¶ 4.

decreased range of motion, nor a decrease in muscle strength or neurological function.  Notably, she did not squarely address Dr. Cupps' diagnosis of fibromyalgia or the severity of the symptoms he described.  By letter dated October 11, 1999, Prudential, relying on Dr. Brachman's review and applying the standard for Total Disability during the Initial Duration,[26] denied plaintiff's application for LTD benefits, concluding that "there is no medical documentation ... that [plaintiff] has an impairment so severe" that it prevents [her] from performing the material and substantial duties of [her] sedentary job functions."

13.  Plaintiff twice appealed this denial, each time providing additional evidence in support of her claim that she was totally disabled within the meaning of the Plan.  In support of her first appeal, plaintiff submitted additional evidence, including the following:

(a) Two additional letters from Dr. Cupps supporting plaintiff's claims of total disability, including the following statement in a March 6, 2000 report:

> Ms. Neumann remains markedly symptomatic with a pattern of severe fatigue ... as a result of Fibromyalgia.  The severe fatigue, in and of itself disables her from performing even sedentary work.  She normally requires significant naps during the day.  Ms. Neumann cannot even sustain the energy necessary to perform activities of daily living for more than two hours prior to stopping because of fatigue.  Ms. Neumann certainly is unable to sustain the energy necessary to perform an eight hour work day.[27]

(b) Dr. Les Gavora, plaintiff's primary care physician and a board-certified internist,

---

[26] To establish Total Disability during the Initial Duration, a plan participant must show that she is "unable to perform for wage or profit, the material and substantial duties of *her occupation* [emphasis added]."

[27] It appears that an original copy of this March 6, 2000 letter was not included in the record, but it is cited multiple times in letters from plaintiff's counsel before the plan administrator.  Despite plaintiff's reliance on this letter in its briefing, defendant did not object to its admission and so it is appropriate to rely on it here.

diagnosed plaintiff with both fibromyalgia and chronic fatigue syndrome and submitted a

report stating:

> Ms. Neumann continues to suffer from severe chronic fatigue and fibromyalgia ....
> Because of her extremely poor endurance, exercise tolerance and limited ability
> to perform tasks, I continue to believe that she is truly disabled from work at this
> time. ... Approximately 10% of chronic fatigue and fibromyalgia patients are
> disabled and unable to work and 90% are able to maintain gainful employment
> with their disorder.  The severity of her symptoms and the multiple deficits
> encountered put her in a disabled category at this time.

14.  Upon receiving plaintiff's appeal, Prudential initiated a second review by an

independent file reviewer and specialist in rheumatology, Phillip Kempf, M.D.  Like Dr.

Brachman, Dr. Kempf did not physically examine or interview plaintiff but simply reviewed

plaintiff's medical file.  In a two-paragraph report, Dr. Kempf concluded that there was no

evidence of an active autoimmune disease, and that he could find "no limitations to support

[plaintiff's] long-term disability or inability to work."  With respect to plaintiff's claims of

cognitive disability, in a follow-up letter, Dr. Kempf wrote that "no objective testing" had been

done and that plaintiff would need "extensive neuropsychiatric testing" to determine whether she

had any medically documented illness that would cause significant cognitive decline.

Significantly, Dr. Kempf did not specifically address Dr. Cupp's diagnosis of fibromyalgia, nor

that physician's conclusions concerning the severity of plaintiff's condition.  Relying on this

report, on July 7, 2000, Prudential denied plaintiff's first appeal.

15.  Following this first denial, plaintiff sought to provide "objective evidence" of her

decreased cognitive abilities by submitting to an examination by Leonard G. Perlman, Ed.D., a

consultant in rehabilitative psychology and a vocational expert with regular experience testifying

in disability hearings before the Social Security Administration.  Dr. Perlman conducted a

psychological-vocational assessment of plaintiff and submitted a five-page report and a three-page Medical Assessment of Ability to do Work-Related Activities, concluding that plaintiff could not sustain gainful employment.  Dr. Perlman specifically found no evidence of malingering in plaintiff's test-taking behavior, and conducted a variety of tests, which Dr. Perlman claims provide "objective" evidence of plaintiff's reduced cognitive abilities.[28] In a related matter, Dr. Perlman administered the Purdue Pegboard test of finger dexterity on which plaintiff performed at or below a fifteenth percentile when compared to Industrial Applicant norms.  Dr. Perlman concluded that plaintiff would not be productive in tasks that involved eye-hand coordination or in which speed and accuracy were required.  During the course of a more than two-hour examination, Dr. Perlman observed that plaintiff's "fatigue was intense and debilitating," that "her energy level was generally poor" and that her "cognitive abilities were limited and concentration/attention deficits were noted especially during objective testing."  Based on his examination, Dr. Perlman found (i) that plaintiff's "concentration and attention are significantly impaired and would most likely worsen under stress or pressure found in work settings," (ii) that plaintiff "fatigues easily and has a very low energy level and [sic] requiring sleep during the daytime (at least 2 hours in the morning and 2 hours in the early afternoon) ... .; (iii) that due to pain and fatigue, plaintiff would "miss a few days of work per week/or need to

---

[28] These tests included the Rey Auditory Memory test, on which plaintiff performed at the first percentile when compared with adult norms, the Wide Range Achievement Test - 3rd revision (WRAT-3), on which plaintiff received scores less than expected given her four-year college degree, which reflected "some problems in concentration combined with fatigue," and the Wechsler Adult Intelligence Scale-Revised (WAIS-R), on which she showed average intelligence, but Dr. Perlman noted "considerable intra-subtest scatter suggesting problems with concentration and attention and limitations with functioning."  Dr. Perlman also noted that seriously limiting her behaviors on this final test were "deficits in concentration, ability to stay focused, fatigue, discomfort and pain in various joints and muscles."

take [1] hour to 2 hour breaks during a work day," which, he concluded, "would not be tolerated in [a] competitive labor market."  Thus, Dr. Perlman concluded that plaintiff "could not sustain any gainful employment due to the wide array of physical limitations and the emotional factors that accompany these problems."

16.  Plaintiff submitted Dr. Perlman's report in support of a second appeal to Prudential. Before resolving plaintiff's second appeal, Prudential contracted with an Independent Medical Examiner ("IME") to conduct a personal examination of plaintiff.  Significantly, that examiner, Mayo F. Friedlis, M.D., found no evidence of malingering on the part of plaintiff.  Dr. Friedlis stated that his diagnosis was that plaintiff suffered from (i) fibromyalgia syndrome, (ii) a history of chronic fatigue syndrome, and (ii) possible subclinical hypothyroid state.  He concluded that plaintiff is not working primarily because of her cognitive difficulties, which he found to be "clearly defined" by the records provided for his review.  He also found that her chronic fatigue was a limiting factor.  Dr. Friedlis affirmed plaintiff's diagnosis with fibromyalgia, but concluded that plaintiff's fibromyalgia was "not per se severe enough to in and of itself keep her from working."  Further, he concluded that while plaintiff might be capable of returning to the workforce in the future with appropriate treatment, she was "not at [that] time capable of returning to the work force in any capacity."

17.  Based on plaintiff's submission of Dr. Perlman's report and on the report it commissioned from Dr. Friedlis, Prudential granted plaintiff's second appeal on January 30, 2001.  Specifically, Prudential found that plaintiff had satisfied the standard for Total Disability for the Initial Duration, granted plaintiff's appeal, and awarded her LTD benefits retroactive to September 11, 1999 and through September 10, 2001.

18.   Three months later, by letter dated April 5, 2001, Prudential notified plaintiff through her attorney that her LTD benefits would expire at the end of the Initial Duration on September 11, 2001.  Further, the letter stated that "even though benefits may continue beyond this initial period, we do not waive our right to evaluate your claim under the more restrictive definition of Total Disability."[29]   The letter requested only that plaintiff complete a Comprehensive Claimant's Statement.  Plaintiff complied on May 15, 2001.

19.   Shortly before September 11, 2001, Prudential conducted its own internal review of plaintiff's file.  Specifically, two internal reviewers, both employed by Prudential, examined plaintiff's medical file and recommended that she not be awarded benefits.

(a)   Prudential's Medical Director, Bob McBride, M.D., concluded that "the medical evidence ... is almost totally of a self-reported nature." He also criticized the conclusions of Dr. Friedlis, the IME, on this basis. Further, with respect to Dr. Perlman's findings, he recommended "obtain[ing] and critically evaluat[ing] the Raw Test scores from the [neuropsychological testing] ... performed by Dr. Perlman."[30]   From this review, McBride found it difficult to see "medically determinable evidence of an impairment of sufficient extent and duration as to explain and support total, continuing loss of work capacity."

(b)   Another in-house physician, Marcia Scott, M.D., also reviewed the file and recommended denying benefits.  Scott observed that the medical evidence of plaintiff's fibromyalgia was "almost totally self-reported." She also criticized the nature of Dr. Perlman's findings, noting that Dr. Perlman is not a certified neuropsychologist, but an educational psychologist and that "[n]o neuropsychological battery was done." Thus, she concluded that the medical file "does not support that claimant has impairments severe enough to prevent her from working."

---

[29] After the Initial Duration, an applicant for benefits under the Plan must show that the applicant is unable "to perform for wage or profit, the material and substantial duties of *any job* [emphasis added] for which [she is] reasonably fitted by [her] education, training, or experience," not just plaintiff's current occupation.

[30] According to plaintiff, Prudential never requested this raw test score data.

20.  Following these internal reviews, on August 27, 2001, Prudential terminated plaintiff's LTD benefits effective September 11, 2001, finding that she had not satisfied the definition of "Total Disability," which after the Initial Duration, required plaintiff to show that she was unable to perform the material and substantial duties of any job for which she was qualified.  This decision did not note any change in plaintiff's condition after January 30, 2001, the date Prudential found plaintiff to be totally disabled for the purpose of performing the duties of her own sedentary occupation.

21.  Plaintiff appealed Prudential's decision three separate times and was denied each time.  In addition to further reports from Dr. Gavora that plaintiff continued to be disabled and "attempts to employ her in any meaningful capacity would not be successful and would further complicate her status," plaintiff submitted the report of Marco D. Castro, M.D., a neurologist. He also diagnosed plaintiff with fibromyalgia, chronic fatigue syndrome, and cognitive dysfunction.  He was unable to establish that plaintiff suffered from a specific underlying neurological disorder, but diagnosed plaintiff as suffering from "cognitive dysfunction" related to "mild abnormalities conspicuous during an electroencephalogram."

22.  Also in support of her application for LTD benefits, plaintiff notified Prudential that on December 14, 2001, the Social Security Administration ("SSA") awarded plaintiff Social Security benefits after an Administrative Law Judge found that plaintiff's assertions concerning her ability to work were credible and that she was unable to perform sedentary work for an 8-hour workday, and concluded that she was under a "disability," as defined by the SSA.[31]

_____

[31]  The SSA defines disability as "[t]he inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of

23.   During the course of these appeals, Prudential again contracted with independent file reviewer Dr. Brachman to review plaintiff's medical file.  Dr. Brachman conducted a review of plaintiff's medical file and while she agreed that plaintiff had been accurately diagnosed with fibromyalgia, she concluded that plaintiff was "not physically impaired from performing the essential functions of her own or any sedentary occupation because of symptoms related to fibromyalgia."  She reached this conclusion in part because plaintiff's symptoms did not appear to have progressed over the two years between the onset of her first symptoms in 1997 and when she left work in 1999.  Further, she placed great weight on a number of general conclusions about fibromyalgia.  Specifically, she stated that "the worst treatment for fibromyalgia patients is prolonged rest and removal from a sedentary workplace."  She argued that the "medical literature indicates that individuals with fibromaylgia are physically able to perform even heavy work demands." Thus, she recommended that fibromyalgia patients, such as plaintiff, avoid repetitive motions (as they have difficulty keeping up with time demands), heavy lifting, and work in safety sensitive jobs.  She also found no evidence of an active autoimmune disease and stated that she could not evaluate plaintiff's symptoms of cognitive impairments because they were outside her degree of speciality.

24.   Disputing Dr. Brachman's report, Dr. Gavora submitted an additional report in support of plaintiff's third and final appeal.  Dr. Gavora noted that in his experience, fibromyalgia patients tend to "fight through" their illness despite an inability to do so

---

not less than twelve months."  20 C.F.R. § 404.1505(a).  To meet this definition, an applicant must show that she has a "severe impairment(s) that make you unable to do your past relevant work ... or any substantial gainful work that exists in the national economy."  *Id.*

successfully and despite a declining quality of life.  In his opinion, the two-year period from 1997

to 1999 was consistent with this time course.  Dr. Gavora also challenged Dr. Brachman's

conclusions about fibromyalgia.  He noted that "[f]ibromyalgia has been a recognized medical

entity since the 1990's when the World Health Organization issued a formal statement and policy

recognizing this disorder providing a frame work for its evaluation and treatment worldwide."

Further, he argued that Dr. Brachman's assertion that sufferers of fibromyalgia tend to be capable

of doing heavy workloads is inconsistent with his understanding of the medical literature.  He

also challenged Dr. Brachman's conclusion that it is inappropriate to remove *any* fibromalgia

patient from a sedentary workplace and stated that he did not believe it to be a given that all

patients could achieve this level of performance.  Finally, he again noted that multiple studies

showed that 5-15% of fibromyalgia sufferers are unable to function at a sufficiently high level to

remain reasonably active and that plaintiff's status put her within this group.

    25.  On March 18, 2004, Prudential denied plaintiff's third and final appeal for LTD

benefits, concluding that "there are no medically determinable impairments documented in the

records to support [the statement that plaintiff falls into the 5 to 15% of fibromyalgia sufferers

who are unable to work] or to support restrictions from sedentary work."  This final decision was

reviewed by Prudential's Appeals Committee and denied.

**E. Procedural History**

    26.  On August 12, 2004, plaintiff filed the instant ERISA action alleging (i) that

Prudential violated the requirements of ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B),

by failing to provide benefits under the Prudential Plan for which plaintiff was eligible, and (ii)

that Prudential violated ERISA by failing to provide the "full and fair review" required by

ERISA section 503, 29 U.S.C. § 1133.[32]  Plaintiff seeks the following relief:

> (i) a declaration that she is totally disabled, within the meaning of the Prudential Plan, and that Prudential is obligated to provide her with disability benefits until she is no longer totally disabled;

> (ii) a judgment equivalent to the disability benefit payments owed by Prudential since the date of her termination, plus interest, costs, and attorney's fees; and

> (iii) an order instructing Prudential to reinstate any of plaintiff's life, health, and retirement insurance coverages that may have been terminated along with her LTD benefits.

## F.  Legal Standard

27.  On *de novo* review, the task for a district court is to "consider the issue of whether the plaintiff is entitled to disability benefits 'as if it had not been decided previously.' " *Hughes v. Prudential Life Ins. Co. of Am.*, 2005 U.S. Dist. LEXIS 6188, at *13 (W.D. Va. 2005) (quoting *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992)). Thus, no deference is owed to Prudential's determination that plaintiff is not entitled to benefits.  And while there is discretion on *de novo* review to allow evidence not before the plan administrator if "necessary to conduct an adequate de novo review of the benefit decision,"[33] such additional evidence is not necessary to an adequate review and so analysis proceeds here on the record as presented to the Plan administrator.

28.  The issue to be determined is whether plaintiff is totally disabled within the meaning of the Plan and thus entitled to LTD benefits. Under the terms of the Plan, to reach a finding of

---

[32] The parties did not raise this claim in their briefs or at oral argument.  Nor does the complaint allege any facts to suggest that plaintiff was denied "a full and fair review" as required by 29 U.S.C. § 1133. Thus, because the complaint fails to state a claim with respect to this count, it must be dismissed.  *See* Rule 12(b)(6), Fed. R. Civ. P.

[33] *See Quesinberry*, 987 F.2d at 1025.

"Total Disability" once the Initial Duration has expired, it must be shown (i) that plaintiff is not working at any job for wage or profit, (ii) that she is under the regular care of a doctor, and (iii) that she is "not able to perform for wage or profit, the material and substantial duties of any job for which [she is] reasonably fitted by [her] education, training, and experience." The parties do not dispute the first two requirements and, for the reasons that follow, the record persuasively supports the conclusion that plaintiff has established the third.

**G. Plaintiff Has Satisfied the Definition of Total Disability**

29. It is undisputed that plaintiff suffers from fibromyalgia and inactive autoimmune disease syndrome. Every physician either to examine plaintiff or to review her file has diagnosed plaintiff with fibromyalgia or has not disputed this diagnosis, although they disagree about the severity of her symptoms. The experts also agree that plaintiff's autoimmune disease is inactive and cannot disable her from working. Thus, the key question is not whether plaintiff suffers from fibromyalgia – for all experts agree on this point – but whether her symptoms are so severe as to make plaintiff unable to perform the material and substantial duties of any job for which she is qualified.[34]

30. In essence, determining whether plaintiff's fibromyalgia is so severe as to make her totally disabled reduces to a credibility contest. On the one hand, Drs. Cupps, Gavora, Perlman, and Friedlis, the latter Prudential's independent medical examiner, all concluded that plaintiff's symptoms are so severe as to disqualify her from working in any capacity. On the other hand,

---

[34] Some experts, including Drs. Gavora, Friedlis, and Castro, have also diagnosed plaintiff with chronic fatigue syndrome. No experts have openly challenged this diagnosis and it appears that some have instead attributed plaintiff's profound fatigue to her fibromyalgia. In any event, regardless of the diagnosis, it is clear that many experts agree that plaintiff's fatigue is profound and disabling, while others dispute this assessment.

Drs. Kumpf, McBride, Scott, and Brachman, all retained or employed by Prudential and none of whom examined plaintiff, conclude that plaintiff is not totally disabled from work.  Thus, it is necessary to determine which experts' opinions should be accorded decisive weight.

31.  After a thorough review of the evidence in the record, it is appropriate to find that the most credible experts are those that concluded plaintiff is unable to work in any capacity – Drs. Cupps, Gavora, Perlman, and Friedlis.  Particularly persuasive in this regard is the opinion of Prudential's own independent medical examiner, Dr. Friedlis.  Although independent medical examinations are not required, they can prove "especially significant" where, as here, "the plan administrator is operating under a conflict of interest or rejects a treating doctor's opinion."[35] *Hughes*, 2005 U.S. Dist. LEXIS 6188, at *15 (quoting *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp. 2d 645, 650-51 (D. Md. 2002)); *see also Case v. Cont'l Cas. Co.*, 289 F. Supp. 732, 739-40 (E.D. Va. 2003) (finding that rational decision maker acting under conflict of interest should not have discounted opinions of two treating physicians without seeking an independent examination of plaintiff).  This sensible conclusion follows because an independent medical examiner has an opportunity to assess a plaintiff's symptoms first-hand and to make a determination regarding her ability to return to work that is not conflicted by the plan administrator's interest in reducing costs and increasing profits.  Here, Prudential requested an independent medical examiner, but then rejected this examiner's findings, including his conclusions that plaintiff's cognitive difficulties were "clearly defined" by the record provided for review, and most significantly, his conclusion that plaintiff is not "capable of returning to the

---

[35] This principle operates in the *de novo* context as it does in the abuse of discretion context, as *Hughes* reflects.  *See* 2005 U.S. Dist. LEXIS 6188, at *15-16.

work force in any capacity." While Prudential is not bound by the findings of its IME, it is significant that Prudential did not seek a second examination by a different examiner. In any event, Dr. Friedlis' independent conclusions, as they are based on an extensive examination and interview, are persuasive.

32. Also persuasive is that every expert who physically examined or personally interviewed plaintiff concluded that she was unable to return to the work force in any capacity at this time. In sharp contrast to these opinions is that every Prudential expert to conclude that plaintiff has not satisfied Prudential's definition of "Total Disability," Drs. Kempf, McBride, Scott, and Brachman, never examined or interviewed plaintiff, but merely reviewed her medical file. Thus, their opinions are not persuasive. *See Stup*, 390 F.3d at 310 & n.8 (rejecting reasoning of physician who had not seen nor examined plaintiff); *Hughes*, 2005 U.S. Dist. LEXIS 6188, at *15 (finding unpersuasive evaluation by physician who never examined plaintiff nor performed any type of clinical interview). Notably, Prudential relied on the opinions of these file reviewers, two of whom were Prudential employees, to deny plaintiff's claims for benefits. On the other hand, Drs. Cupps, Gavora, Perlman, and Friedlis, all of whom physically examined plaintiff, concluded that the *severity* of plaintiff's symptoms made her incapable of being employed in any capacity, including sedentary work. By direct examination of plaintiff, these experts were able to assess first-hand plaintiff's symptoms (*e.g.* Dr. Perlman during a two-hour examination observed that plaintiff's "fatigue was intense and debilitating" and that she had trouble concentrating during objective testing). Moreover, these experts had an opportunity to assess plaintiff's veracity, particularly important in assessing a condition for which there is no laboratory diagnosis and that depends, in part, on self-reporting of symptoms. Importantly, Drs.

-30-

Perlman and Friedlis specifically reported that plaintiff exhibited no evidence of malingering.  In contrast, every expert to conclude that plaintiff could return to work never had an opportunity to make such first-hand observations.  Thus, the opinions of plaintiff's examining experts and Dr. Friedlis are entitled to persuasive, indeed decisive, weight.

33. Prudential argues that were its decision reviewed for an abuse of discretion, which it is not, it could not be required to accord any special weight to plaintiff's treating physicians, citing the Supreme Court's holding in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.").  While true, it is important to note, that the Supreme Court found that a plan administrator need not specially credit a claimant's *treating physician*, but said nothing about the relative credibility of *examining physicians* who have the opportunity to examine and interview plaintiff directly.  The opinions of Drs. Cupps, Perlman, Gavora, and Friedlis are more persuasive not because they are treating physicians – indeed not all are – but because each physically examined and interviewed plaintiff.[36]  And for the reasons already stated, examining experts may be more persuasive than those that merely review a paper record.  Moreover, the Supreme Court also made clear that a plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*  Put simply, a plan administrator still must credit the opinion of a treating physician if that physician does a better job.  This is particularly important, where, as here, the reviewing task is not to determine whether Prudential abused its discretion by relying on its

---

[36]  For example, Dr. Friedlis is an examining physician, hired by Prudential to conduct an independent examination of plaintiff, but is not plaintiff's treating physician.

experts to the exclusion of plaintiff's treating physicians, but rather to determine on a *de novo* review of the record whether the evidence supports a finding that plaintiff was totally disabled. In this case, considering the evidence without the conflict attendant Prudential's decisions, it is clear that the examining physicians, including plaintiff's treating physicians, are more persuasive.

34.   There are other reasons to reject the opinions of those experts that conclude that plaintiff is not totally disabled.  Specifically, Drs. McBride and Scott, who reviewed plaintiff's file before recommending that she be denied benefits are both employed by Prudential (indeed Dr. McBride is Prudential's Medical Director) and thus operate under a conflict that might color their view of plaintiff's illness and the strength of the evidence presented to support its severity. Dr. Kumpf, although an independent file reviewer, appears to have given short shrift to his review.  Dr. Kumpf reviewed plaintiff's file and issued only a cursory two-paragraph report, failing even to mention or address the diagnosis of fibromyalgia and including significant factual errors in his report.[37]

35.   Dr. Brachman's opinion is also subject to doubt.  Although Dr. Brachman noted that plaintiff continued to work for a period of time following the onset of her symptoms, it is entirely logical, as Dr. Gavora suggests, that a fibromyalgia patient suffering from increasing pain and fatigue would attempt, for a time, to "fight through" despite decreased productivity and increasing pain and fatigue.  Additionally, Dr. Brachman's opinion is not persuasive because she does not appear to believe that *any* patient with fibromyalgia can be totally disabled from sedentary work.  Significantly, she concurred that plaintiff was accurately diagnosed with

---

[37] For example, Dr. Kumpf noted that plaintiff had worked for 10 years despite her symptoms when, in fact, plaintiff did not experience the onset of most of her symptoms until late in 1997, less than two years before she left her job.

fibromyalgia and did not challenge directly the reported severity of plaintiff's symptoms.

Instead, she drew broad, general conclusions about the ability of fibromyalgia patients to

"perform even heavy work demands."  Further, she asserted that "[t]he worst treatment for

fibromyalgia patients is prolonged rest and removal from a sedentary workplace," and that such

treatment "only exacerbates the symptoms and maintains the 'sick state.' " Dr. Brachman

discounts any possibility of a fibromyalgia sufferer having symptoms so severe that she is totally

disabled from any sedentary work.  Yet, Dr. Gavora persuasively refuted these sweeping

conclusions and concluded, from his own review of the medical literature, that 5 to 15% of

fibromyalgia sufferers are unable to function at a sufficiently high level to remain reasonably

active.  Indeed, the Fourth Circuit recently recognized that while many who suffer from

fibromyalgia can carry on daily activities, some people have "such a severe case ... as to be

totally disabled from working."  *Stup*, 390 F.3d at 303 (upholding district court ruling that plan

administrator abused its discretion by denying LTD benefits to fibromyalgia sufferer) (quoting

*Sarchet*, 78 F.3d at 307) (citations omitted).  Plaintiff should not be denied benefits based on the

opinion of a single expert that fibromyalgia sufferers cannot be totally disabled.  Thus, Dr.

Brachman's opinion is not persuasive.

36.  Therefore, based on the evidence in the record and relying on those experts found to

be more credible, it is appropriate to conclude that plaintiff's symptoms are severe and that she is

unable to perform the material and substantial duties of any job for which she is qualified.  The

evidence includes written opinions from two Board-certified internists, an educational

psychologist who specializes in rehabilitative psychology and regularly testifies in disability

hearings before the SSA, and Prudential's own Independent Medical Examiner, all of whom

concluded that plaintiff is unable to perform even sedentary work.  Dr. Cupps examined plaintiff

on multiple occasions over an extended period of more than a year and concluded that plaintiff's

fatigue, in and of itself disables plaintiff from performing even sedentary work.  He reported that

plaintiff cannot sustain the energy to perform normal activities for daily living for more than two

hours at a time and requires significant naps throughout the day.  Thus, he concluded that

plaintiff "is unable to sustain the energy necessary to perform an eight hour work day."

Likewise, Dr. Gavora, plaintiff's primary care physician, reported plaintiff's poor endurance,

exercise tolerance and limited ability to perform tasks.  He concluded that plaintiff is one of the

ten percent of fibromyalgia and chronic fatigue patients who are disabled and not able to work

because of their illness.  Dr. Perlman, though not a physician, is certainly able as an educational

psychologist to assess the effect of plaintiff's symptoms on her ability to perform the material

and substantial duties of any job for which plaintiff is qualified.  He noted that plaintiff's

"concentration and attention are significantly impaired," that plaintiff's "fatigue was intense and

debilitating" and that she required regular naps that would not be tolerated in a competitive labor

market.  Based on his observations and the tests he administered, he concluded that plaintiff

"could not sustain any gainful employment." The opinions of these experts plainly support the

conclusion that plaintiff is unable to perform the material and substantial duties of any job for

which she is reasonably qualified.[38]

---

[38]  Worth noting, though not dispositive, are two additional arguments raised by plaintiff.
The first is that Prudential is bound by its conclusion in January 2001 that plaintiff was totally
disabled because it found that she could not perform the responsibilities of her sedentary
occupation.  Thus, plaintiff argues, plaintiff is also totally disabled under the "any job" standard
applicable after the Initial Duration because any other job plaintiff might perform would also be
sedentary.  *See Hensley v. IBM*, 123 Fed. Appx. 534, 2004 U.S. App. LEXIS 25742, at *7 n.2
(4th Cir. 2004) (unpublished disposition) (finding that "regular occupation" definition of

37.  Prudential challenges this conclusion, arguing that plaintiff's application for LTD should be denied because she has failed to provide any "objective medical evidence" of her disability.  To be sure, it is appropriate for a plan administrator to accord substantial weight to the absence of objective evidence of a disability claim, especially if a claimant's subjective pain complaints are suspect or unreliable.[39]  Yet, this principle is not applicable here for plaintiff has

_____

disability was functionally equivalent to "any occupation definition" where dispute focused on applicant's ability to perform any sort of sedentary labor).  To be sure, Prudential did not identify any reasons for its conclusion that plaintiff was unable to perform her sedentary job as a Senior Business Analyst, but yet is able to perform some different sedentary job.  And there is certainly reason to be skeptical of such a seeming reversal of decision to grant benefits, especially where, as here, the plan administrator operates under a conflict.  Nonetheless, a participant has no vested right to a benefits decision, once made, and a plan administrator is free to change a benefits decision upon further investigation and review.  *See Hensley*, 2004 U.S. App. LEXIS 25742, at *7.  The key inquiry is not whether Prudential changed its mind, but whether the evidence in the record, considered *de novo*, supports a finding of Total Disability.

Plaintiff also points to the Social Security Administration's ("SSA") ruling that plaintiff has been under a "disability," as defined in the Social Security Act, since March 15, 1999.  It is well-settled that SSA decisions are not binding on a plan administrator and that there is "no obligation to weigh the agency's disability determination more favorably than other evidence." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir. 1999) (holding that Social Security determinations are not binding, particularly when disability standards are not analogous). Further, the Supreme Court recently warned that critical differences between the Social Security disability program and ERISA benefits plans caution against importing standards from the first context into the second.  *See Nord*, 538 U.S. at 832-33 (rejecting application of treating physician rule from Social Security proceedings in ERISA context).  In any event, although SSA determinations are not binding or controlling, it is worth noting that the Administrative Law Judge ("ALJ") in plaintiff's SSA case reached conclusions about plaintiff's condition similar to the conclusions reached here.  Thus, the ALJ found (i) that plaintiff is under a "disability," (ii) that plaintiff is unable to perform her past work or any substantial gainful work that exists in the economy, (iii) that plaintiff suffers from fibromyalgia and chronic fatigue syndrome, (iv) that plaintiff's assertions concerning her ability to work are credible, and (v) that she is unable to perform sedentary work for an 8-hour workday.

[39] *See Williams v. UNUM Life Ins. Co. of Am.*, 250 F. Supp. 2d 641, 648-49 (E.D. Va. 2003) ("Without an objective component to this proof requirement, administrative review of a participant's claim for benefits would be meaningless because a plan administrator would have to accept all subjective claims of the participant without question."); *Hensley*, 2004 U.S. App. LEXIS 25742, at *12-13 (overturning district court's benefits award where district court relied on

provided some objective evidence of her condition and moreover, there is no reason to suspect the veracity of her self-reported symptoms or to believe that they might be unreliable.

38.  To the extent that it is possible to submit objective evidence of her severe fibromyalgia condition, plaintiff has done so.  Specifically, although no laboratory test is available to diagnose fibromyalgia, all physicians agree that upon a musculoskeletal exam plaintiff satisfies the objective standard for fibromyalgia established by the American College of Rheumatology of pain in 11 of 18 points located throughout the body.  Moreover, plaintiff presented the results of a number of tests administered by Dr. Perlman, which furnish some objective evidence of plaintiff's cognitive difficulties, short-term memory problems, and pain in the course of performing routine tasks.  Further, Dr. Castro, a neurologist, offered further objective evidence of plaintiff's cognitive disability noting "mild abnormalities conspicuous during an electroencephalogram."  Prudential wants more.  Yet, the Plan language does not explicitly qualify the type or quantify the amount of such evidence that is required to establish Total Disability; indeed, it does not explicitly require objective evidence at all.  At least on *de novo* review, therefore, while it is appropriate to require plaintiff to offer objective evidence to corroborate her subjective complaints, it is not sufficient for Prudential to object that, even in the face of evidence that supports a finding of total disability, plaintiff must submit a specific type of

---

subjective pain complaints despite evidence of symptom magnification); *Lown v. Continental Casualty Co.*, 238 F.3d 543, 546 (4th Cir. 2001) (upholding denial of benefits where treating physician offered only his own opinion of disability based on his many years' experience of treating patients); *Ellis*, 126 F.3d at 231 (approving reliance on board of non-treating consultants over opinions of treating doctors who credited claimant's pain complaints but *could not pinpoint etiology*).

objective evidence not in the record, or have her benefits presumptively denied.[40]

39.  Moreover, if there is some objective evidence of a claimant's disability in the record, a claimant's subjective complaints, if reliable, should not be discounted out of hand.  This is particularly true where, as here, there are no objective laboratory tests for the presence or severity of this potentially debilitating disease.  *See Sarchet*, 78 F.3d at 305; Nat'l Institutes of Health, *supra*, at 4-5.  It is plain that certain disabling conditions may exist with very little, or even no, objectively measurable signs or indicators.  It is unreasonable in the circumstances, therefore, to reject evidence of self-reported symptoms resulting in disability where, as here, the plaintiff suffers from an illness that medical professionals agree is not readily susceptible to objective medical tests and where there is no evidence of malingering.  Two physicians explicitly found that plaintiff exhibited no evidence of malingering, and no doctor who examined plaintiff found any reason to suspect that plaintiff was exaggerating her symptoms.  Further, plaintiff consistently reported the same symptoms to multiple doctors over the course of more than two years.

In sum, a *de novo* review of the record presented to Prudential as the Plan administrator persuasively shows that plaintiff has satisfied the definition of Total Disability and, therefore, that she is entitled to receive disability benefits retroactive to the date they were terminated.

An appropriate Order will issue.

|  |  |
|---|---|
|  | _____/s/_____ |
| Alexandria, Virginia | T. S. Ellis, III |
| April 28, 2005 | United States District Judge |

---

[40] For example, Prudential objects that plaintiff offered evidence of her cognitive disability from Dr. Perlman, an educational psychologist, and of mild abnormalities conspicuous during an electroencephalogram," which Dr. Castro found indicated "cognitive dysfunction." Instead, it argues that plaintiff must submit evidence of neuropsychological testing.